**DESERT PALACE, INC., d/b/a Caesars Palace, Plaintiff-Appellee,**

v.

**LOCAL JOINT EXECUTIVE BOARD OF LAS VEGAS, and Culinary Workers Union, Local 226, and Bartenders Union, Local 165, Defendants-Appellants.**

**No. 80–5945.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 2, 1982.

Decided June 15, 1982.

Nancy S. Roberts, Davis, Cowell & Bowe, San Francisco, Cal., for defendants-appellants.

William J. Rosenthal, Shawe & Rosenthal, Baltimore, Md., for plaintiff-appellee.

Before POOLE and BOOCHEVER, Circuit Judges, and SOLOMON,* District Judge.

SOLOMON, District Judge:

Desert Palace, Inc. (the Hotel), which owns and operates Caesars Palace in Las Vegas, brought this action under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, to vacate an arbitration award in favor of the Local Joint Executive Board of the Culinary Workers and Bartenders Locals (the Union). The district court entered summary judgment for the Hotel. The Union appealed. We reverse.

### I.

The Hotel has a large showroom where it stages two shows a night featuring well-known entertainers. Before May 18, 1978, patrons made show reservations with a Hotel reservations clerk. The charge for the show was the same for each patron, regardless of the seating location. The price of the show included two or three drinks. The patron could order additional drinks at regular Hotel bar prices. At the end of the show, the cocktail server would give the patron a bill that included the charge for the show plus the charge for the extra drinks. Most patrons gave the server a tip. Patrons usually computed their tips based on the total bill, which averaged about $25 a patron.

Some patrons used tickets, coupons, or package prices to pay for the show. When the ticket, coupon, or package price constituted a "special event" as defined in the collective bargaining agreement, the agreement required the Hotel to pay the cocktail

---

* Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation.

server 15 percent of the charge to the general public for the show.

On May 18, 1978, the Hotel adopted a computerized "Ticketron" system. Under the new system, patrons continued to make reservations through the Hotel reservations clerk, but they paid for the show ticket before instead of at the end of the show. The price of the ticket varied with the location of the table. The price of the ticket did not include drinks. The patron could order drinks at $1.00 instead of the $2.00 to $3.50 charge at the Hotel bars. As a result of this change, the bill presented at the end of the show included only the drinks the patron had ordered. There was evidence that the servers who had formerly averaged $78 to $125 a week in tips were now only averaging from $20 to $25 a week.

The Union, under it's collective bargaining agreement, filed a grievance against the Hotel. The agreement provided a grievance and arbitration procedure for a "dispute or difference of opinion between the Union and the Employer involving the meaning, interpretation, application to employees covered by this Agreement, or alleged violation of any provision of this Agreement".

The Union asserted that ticket sales under the Ticketron system were "special events" that entitled the servers to 15% of the price of show tickets. Pursuant to the provisions of the collective bargaining agreement, when the grievance was not resolved by the parties, it was submitted to arbitration.

The dispute in this case centers on the interpretation of sections 18.01 and 18.03(a) of the collective bargaining agreement. Section 18.03(a) provides:

> Cocktail servers serving guests included in a special event . . . . show in the main showroom shall be guaranteed a minimum gratuity per person served of fifteen percent (15%) of the then current minimum charge to the general public for the second show.

"Special event" is defined in section 18.01 as:

> any event for a person, persons, group or groups, arranged by a travel agent, booking agent, hotel sales representative, convention agent, promotional representative, operator or any other individual or agency where tickets, coupons or package prices for food and/or beverages to be served to patrons of such events are involved and where regular employees of an establishment covered by this Agreement provide such service.

The arbitrator found that Ticketron ticket sales were "special events" that entitled the cocktail servers to the guaranteed 15 percent gratuity under section 18.03(a).

The Hotel then petitioned the arbitrator to clarify or modify the method of calculating the amount of the award. The arbitrator denied the petition. The Union threatened to strike to enforce collection of the award. The Hotel then paid the award in full after the Union stipulated that payment would not prejudice the Hotel's rights to seek judicial review. Thereafter the Hotel stopped using Ticketron.

The Hotel filed this action in the district court against the Union to vacate the award. Both parties moved for summary judgment. After a hearing, the court granted the Hotel's motion and vacated the award. The court held that: (1) the arbitrator's interpretation of "special event" ignored the plain and unambiguous meaning of the contract language; and (2) the arbitrator's calculation of the amount of the award under section 18.03(a) was based on an implausible interpretation of "minimum charge" and constituted punitive damages. *Desert Palace, Inc. v. Local Joint Executive Board*, 486 F.Supp. 675 (D.Nev.1980). The Union appealed.

## II.

The scope of review of an arbitration award is limited to whether the award "draws its essence from the collective bargaining agreement" and does not "manifest an infidelity" to the agreement. *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). "It

is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *Id.* at 599, 80 S.Ct. at 1362.

The key question is "whether the arbitrator's interpretation could in some rational manner, be derived from the collective bargaining agreement, viewed in light of its language, its content, and any other indicia of the parties' intention." *Local 1020, United Brotherhood of Carpenters v. FMC Corp.*, 658 F.2d 1285, 1294 (9th Cir. 1981). If, on its face, the award "represents a plausible interpretation of the contract in the context of the parties' conduct", judicial inquiry ceases and the award must be affirmed. *Edna H. Pagel, Inc. v. Teamsters Local 595*, 667 F.2d 1275, 1278–9 (9th Cir. 1982). The correctness of the arbitrator's reasoning and conclusion "is not relevant to a reviewing court so long as the award complies with these standards." *Local 1020, United Brotherhood of Carpenters*, 658 F.2d at 1294.

The rationale for this method of interpretation was set forth by Judge Learned Hand in *American Almond Products Co. v. Consolidated Pecan Sales Co.*, 144 F.2d 448, 451 (2nd Cir. 1944), when he wrote

Arbitration may or may not be a desirable substitute for trials in courts; as to that the parties must decide in each instance. But when they have adopted it, they must be content with its informalities; they may not hedge it about with those procedural limitations which it is precisely its purpose to avoid. They must content themselves with looser approximations to the enforcement of their rights than those that the law accords them, when they resort to its machinery.

The district court concluded that the definition of "special event" in section 18.01 plainly did not include Ticketron sales because: (1) Ticketron sales are not "arranged" within the meaning of section 18.-01; (2) the price of a Ticketron ticket does not include "food and/or beverages"; and (3) Ticketron sales are not "special."

In our view, all three of these contract terms are ambiguous and the arbitrator's construction of these terms is plausible.

### A. "Arranged"

To be a special event under the collective bargaining agreement, the ticket sale must be "arranged by a travel agent, booking agent, hotel sales representative, convention agent, promotional representative, operator or any other individual or agency." Under the Ticketron system, patrons made reservations through the Hotel reservations clerk. Although the Union argued that "any other individual or agency" is broad enough to include a Hotel reservations clerk, the district court disagreed and interpreted "special event" to mean an event arranged by someone other than the Hotel reservations clerk. *Desert Palace*, 486 F.Supp. at 681. The interpretation disregards the fact that before May 18, 1978 the Hotel treated ticketed show reservations made through the Hotel reservations clerk as "special events."

### B. "Food and/or Beverages"

The district court held that the "special event" provision in the collective bargaining agreement applied only when the ticket price included the price of beverages or food. *Desert Palace*, 486 F.Supp. at 683. It is uncertain whether the words "for food and/or beverages" modify the entire phrase "tickets, coupons or package prices" or whether they modify only "package prices." The arbitrator concluded that the price of a ticket need not include the cost of any food or beverage for the ticket to fall within the definition of "special event". He therefore held that a special event included a Ticketron ticket even though the ticket did not include the cost of cocktails.

The district court rejected this interpretation. It concluded that to constitute a special event, a ticket must include the cost of food or beverages and must also be either complimentary or part of a package price. 486 F.Supp. at 681–83. Because Ticketron tickets did not include cocktails and were not complimentary, the court reasoned, they were not special events.

Far from being the only plausible interpretation, the district court's interpretation is contradicted by the Hotel itself. The Hotel has consistently argued that complimentary tickets are specifically excluded from the definition of "special events."

The arbitrator's conclusion that tickets for special events need not entitle the holder to food or beverages is a plausible interpretation of the contract and the court may not substitute its interpretation for that of the arbitrator. It is not the district court's function to choose among the various interpretations of a contract as long as the arbitrator's interpretation is plausible.

As an alternative ground, the arbitrator found that even if the food-or-beverage requirement applied to tickets, Ticketron satisfied the requirement because the Hotel offered drinks to showroom patrons for much less than the regular Hotel bar prices. Hotel witnesses testified that the price reduction was to give showroom patrons "something extra for their money." The arbitrator could reasonably conclude that the ticket was partly "for . . . beverages" within the meaning of section 18.01 because a Ticketron ticket in effect entitled the holder to a discount on drinks.

C. "Special"

The Hotel argues that the parties intended the "special events" procedure to be an exception to the usual showroom billing procedure. The Hotel contends that even though Ticketron sales may fall within the literal definition of "special event," it is not plausible to treat as "special" a billing procedure that applies to every member of the general public who attends a show.

The arbitrator rejected this interpretation. He ruled that "special" means special to the employees, not to the patrons. The arbitrator's interpretation was based on testimony from union representatives that the protection of the tipping potential was a key consideration in the contract negotiations. The Union accepted lower wages in certain job classifications on the understanding that the tipping potential of the jobs would be preserved and that whenever the Hotel deprived the server of the opportunity to present a check for the full price of the show, drinks, and other services, the Hotel would guarantee the server a 15% tip. Ticketron sales are "special" because they are exceptions to the server's general expectation of presenting a check that includes the price of the show.

The district court held the arbitrator had modified the contract in applying it to an unforeseen situation, the Ticketron system.

█ As long as a plausible solution is available within the general framework of the agreement, the arbitrator has the authority to decide what the parties would have agreed on had they foreseen the particular item in dispute. See F. Elkouri & E. Elkouri, *How Arbitration Works* 299–302 (3d Ed. 1973). In such cases, judicial review is limited to whether the arbitrator's solution can be rationally derived from some plausible theory of the general framework or intent of the agreement.

We hold that the arbitrator's interpretation that Ticketron sales were "special events" should be sustained.

III.

A. *Punitive Damages*

█ The arbitrator awarded the servers as a group $1,477,498 for the period May 18, 1978 to March 14, 1979 and from this amount, the regular servers received an average pay of more than $725 a week.[1]

█ The district court held that the award was punitive because it awarded the servers approximately seven times the

---

1. The total amount of the loss and the loss to each server was determined by the parties on the basis of a formula which the arbitrator directed them to follow. They took 15% of the gross amount the Hotel received in Ticketron sales and deducted therefrom $5 a day for each server. They then divided the balance based on the number of days each server worked during the relevant period. The Hotel also deducted the 15% gratuities already paid on "special events".

amount of tips they received before Ticketron.[2] Generally, the remedy for breach of a collective bargaining agreement is limited to an award of compensatory damages. Ordinarily, an award that exceeds the monetary loss which an injured party suffered as a result of a contract breach is considered punitive. *Westinghouse Electric Corp., Aerospace Division v. IBEW Local 1805*, 561 F.2d 521, 523–4 (4th Cir. 1977), *cert. denied* 434 U.S. 1036, 98 S.Ct. 771, 54 L.Ed.2d 783 (1978).

The district court assumed that for an award to be compensatory it must be limited to the tips the servers lost as a result of the Hotel's change to the Ticketron system.

This is incorrect. The arbitrator did not decide that the Hotel breached its contract by instituting the Ticketron system. He found that the breach was the Hotel's refusal to apply section 18.03(a) of the contract to Ticketron sales. By awarding the servers 15 percent of all Ticketron ticket sales, the arbitrator merely restored to the servers the tips they lost when the Hotel refused to honor the 15 percent guaranteed tip provision of section 18.03(a) for Ticketron sales. This award was compensatory and not punitive.

### B. Minimum Charge

Section 18.03(a) entitles servers to 15% of "the then current minimum charge to the general public for the second show." At the time the contract was written, all the seats in the showroom were priced the same but under Ticketron the charge for each show varied with the location of the seat. The arbitrator held that the parties intended "minimum charge" to mean the price of the show itself as opposed to the price of the show plus extra drinks.

The district court rejected the arbitrator's interpretation and held that the minimum charge for each show must be the price of the least expensive seat for that show and that the arbitrator's interpretation of "minimum" renders the word meaningless. We disagree.

The arbitrator's interpretation followed the Hotel's own practices in computing gratuities for special events. Both the Hotel's catering manager and its food and beverage director were responsible for the Hotel's practices and interpretation of "minimum charge" for a "special event." Even if we disagree with the arbitrator's interpretation, we are bound by it as long as his "interpretation met the test which the courts must apply in exercising the limited function of review in cases arising from labor arbitration." *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1132 (3d Cir. 1969).

We believe that the arbitrator's award drew its essence from the contract and that it was a rational and plausible interpretation of the contract viewed in the light of its language and the conduct of the parties.

The judgment of the district court is reversed and the arbitrator's award is reinstated.

---

**2.** The amount of the award was based in part on uncontroverted evidence that the tip income of the servers before Ticketron averaged from $78 to $125 a week. On a five-day week, the servers received from $15.60 to $25 a night for two shows, or between $7.80 and $12.50 for each show. The uncontroverted evidence also showed that the servers averaged $5 a night, or $2.50 for each show in tips after Ticketron. The price of the tickets is high and the audience is made up of many high rollers, junketeers and vacationers. Most of the tips are paid in cash and the figures testified to were the figures reported by the servers on their federal income tax returns. Apparently, the Hotel had its reasons for not challenging these figures even though the tip income materially affected the size of the award.